COBURN (CROPPER v.). See Case No. 3,-416.

COCHECO MANUF'G CO (SPRAGUE v.). See Case No. 13,249.

COCHRAN (GERNON v.). See Case No. 5,-368.

COCHRAN (LAKE SHORE & M. S. R. CO. v.). See Case No. 7,996.

## Case No. 2,927a.
### COCHRAN v. McLEAN.
[Betts' Scr. Bk. 114.]

District Court, S. D. New York. Jan. 22, 1839.

SEAMEN'S WAGES—FOREIGN VESSEL.

[The court will not entertain a libel for wages by seamen of a British vessel, where it does not appear that they have been discharged the ship, and disabled from performing their contract, or from seeking redress in their home tribunals, by any wrongful act of the master, and where the shipping articles provide that they shall not be entitled to their discharge or to wages until the completion of the voyage.]

[Cited in Wood v. The Infanta, Case No. 17,947a.]

[In admiralty. Libel in personam by William Cochran and others, crew of the British ship Colchester, against Allen McLean, her master, for wages.]

BETTS, District Judge. The libel demands wages earned on a voyage from Liverpool to New York. Another action is brought by the same libellants to recover the value of their clothing detained by respondent. The allegation of the libellants is, that they faithfully performed the voyage to this port, and that on the 5th day of September last, they were fully discharged the ship without being paid their wages. The answer excepts to the jurisdiction of the court over the subject matter, the vessel being a British ship, and the crew British subjects, and the matter only cognizable in the British courts. It avers that the libellants were guilty of mutinous conduct on the voyage, and of insubordinate and disorderly conduct in the port; and finally, on the 4th September, deserted the ship, and have since refused to return to their duty, although the respondent has offered to receive them and pay off their board bills in New York. It insists upon a forfeiture of wages and clothes for these causes. The shipping articles put in evidence show a contract by the libellants to perform a voyage from Liverpool to the United States or British America, and back to a port of discharge in Great Britain. It is stipulated in the articles, that 24 hours' absence from the ship during the voyage, under any circumstances, except by permission of the master, shall, if he elects, be deemed a desertion; that actual desertion shall forfeit all the clothes, effects, wages, and emoluments of the deserters; and that no seaman shall be entitled to his discharge or any wages, until the completion of the voyage. On the 4th September

the libellants left the ship without permission of the captain or mate, and went to the consul's office to make complaints. The consul summoned the captain to attend at his office that day. He disregarded the summons, and the consul sent back the libellants to the ship with a note to the master to receive the crew. The master would not take the letter, but a very contradictory account is given of the cause and manner of that refusal by the libellants (in testifying for each other), and the custom house officer who was present. The men represent that the master tore up the letter and peremptorily ordered them on shore, telling them to go back and see what more the consul could do for them. The officer says one of the crew came upon the quarter deck, he seemed excited by liquor, and told the captain he had the consul's order to come on board, and he would be damned if the captain must not take him.

It appears by the testimony of the first mate that the libellants left at 9 a. m. on the 4th, declaring they would do no more work, and were all logged as deserters. Mr. Lester, the custom house officer, says it was understood, from conversations of all the crew, whilst the ship was unloading, that the men did not intend to return in the vessel. The vice consul says the crew preferred complaints when the ship came in, and indeed it is fully proved they left her at that time in a disorderly and mutinous manner, and that he ordered them to go back and discharge the cargo. On the 4th, after she was unladen, they came again, when he summoned the master, and then sent the crew back with a letter. All these facts tend strongly to support the answer that the master never discharged the crew, and that their leaving the vessel was without his consent, and wrongfully. When the master came to the consul's, the 5th, though he refused to pay wages or deliver up the seamen's clothes, the consul says he offered to take them home in the ship, but without wages. This then seems to me to dispose of the whole case. Whatever the consul might have found reprehensible in the temper or manner of the master, the latter has a right under the articles to refuse the seamen's wages until their return home, where the whole matter in dispute would be rightfully litigated and adjusted, and I must say no satisfactory reason is supplied by the consul for interfering with the men or master, and assuming authority to break up their engagement to the ship. If he could, under powers given by his own government, do this, the powers have not been disclosed to this court, and their sufficiency as a protection to the crew for leaving the ship and violating their articles can be more fitly passed upon in tribunals of Great Britain, where all parties owe allegiance, where it was contemplated in the contract that all questions respecting wages

should be settled. It is manifest upon the authorities that courts of admiralty exercise a discretion in entertaining suits in behalf of foreign seamen against a foreign ship or master, and I cannot discern any principle of policy or national courtesy entitled to more serious regard in directing or influencing that discretion than that which goes to maintain the fidelity of seamen to their contract, and the preservation of the entire purposes of the voyage.

When a voyage is broken up, and thereby the seamen are left destitute in a foreign country, or if they are put out of a ship by the wrongful act of the master or owners, it is consonant to the general usages of maritime courts, and seems to me every way fitting, that a remedy should then be afforded them in such foreign courts for the recovery of the moneys due them; but, independent of considerations of general policy which in my judgment very fully enter into the decisions of questions of jurisdiction of this character, it is plain that, giving effect to the agreements between the parties, no right of action exists until the performance by the seamen of the entire voyage. And this tribunal, by entertaining jurisdiction of a suit circumstanced like the present, where the opportunity was open to the parties to return to their own country, would not only sanction a violation of duty by the men, but would establish and enforce rights in their behalf in express contradiction of their own stipulations. It is furthermore to be remarked that, if their rights are to be measured by their own allegations, compared with the proofs, it is manifest that they had incurred a forfeiture of wages within the direct provisions of their articles. having been absent from the ship more than twenty-four hours without permission of the master. They aver that he discharged them on the 5th September. and probably their own testimony, which at first view seems to represent the interview on the 4th on their return from the consul's as their discharge, better comports with the averment of the libel. and that all the discharge actually given was the refusal announced by the master to the consul on the 5th, to receive the men back and reinstate them in their right to wages. The statement given by the crew of what passed on the 4th when they presented the consul's letter to the captain is not very connected or distinct. Dawson says, in his deposition taken the 20th September: "When the crew came to the ship a second time on the 4th, with another letter from the consul, the master took it up and tore it, and told us to go about our business, and go to the consul and see what more he had to do for us." McKenzie, examined the 22d, states the result of the interview in the same words, except he does not say the captain tore the letter,—he threw it down on the deck. Flaws, examined the 24th, says the crew gave the captain the letter and told him what the consul said: "The captain told us to go about our business and go to the consul, and see what more he had to say to us." After he read the note he tore it, and threw it on the quarter deck. Williamson. examined the 24th, says: "The captain told the man to put the letter on the chair. He then, a little after took it up, opened it, laughed, and tore it to pieces, and told us to go to the consul and see what more he had for us to do,—that he had nothing more for us to do."

Cochran, who seems a leading man with the crew, was examined and cross-examined on the 20th, and re-examined the 21st, and again re-examined the 22d September, and was again examined viva voce in court on the 27th December. On the 20th, he represents the particular interview on the 4th to be that the crew gave the letter to the captain; "and he told us to go about our business, and go to the consul again, and see if he had anything more for us to do. We told him the consul told us to go down to the ship again, as usual, and the captain told us to go to the consul again, saying, 'I have nothing more for you to do.'" On his cross-examination he said, when they left the ship in the morning, "we told the captain we were going to the consul's; he told us to go and stop there." Upon his second direct examination he stated that the crew were examined by the consul, and he decided they were to be discharged from the vessel and to have their wages, and on that cross-examination he says, "has never offered to the captain to come on board to do duty." On his examination in court, he says the captain would not take the letter. made witness lay it down on the companion way, and then took it up, tore it to pieces, ordered them all ashore, and pushed witness off, and told him to go about his business. The next day the captain came to the consul's office, and the consul told him to take the men on board, which he refused to do, or to pay wages. On his cross-examination he says, after the crew had been ashore about five weeks the captain offered to take them on board and pay their board bills ashore, but the crew would not go.

Taking the case as the libellants prove it themselves, it is not shown that there was any direct offer by the men to return to duty, or refusal by the captain to receive them, on the 4th September. He refused undoubtedly to acknowledge the authority of the consul, or to have anything to do with the men in obedience to that authority; but Cochran says expressly he never offered to go back to duty, nor is there enough in the statements of any of the libellants to justify the conclusion that all or any of them proffered themselves to the ship again, and to return immediately to. their duties and subordination there. On the other hand, very forcible proofs are produced, showing that the men left the ship on the 4th September in open contempt of the orders of the mate

and captain, and the evidence is clear that the opportunity was kept open for them to the last day the ship remained here, to return with her to their port of destination and discharge.

This court will proceed cautiously in passing upon the dealings between foreign consuls and the masters and crews of vessels belonging to their governments. It appreciates the delicacy of questions of that character. It will presume that the consul had sufficient reason for advising the crew not to go with the vessel, and for directing the master to pay their wages here; and that these reasons will satisfactorily excuse the proceeding to his own government, as also the maintaining the men here to this day. I am constrained, however, to say that no case has been disclosed to this court which demonstrates the necessity of such measures, or their propriety, to a degree that raises in behalf of these men a right of action, founded thereon, to demand and recover wages here, and thus have the breaking up of their contract pronounced proper and justifiable. This court does not inquire or decide whether the forfeiture set up by the answer and stipulated in the articles is absolute, or is to be construed only as a penalty, conformity to the rule usually applied to American articles. I leave the merits of the action and defence untouched as appertaining to the home tribunals of the parties, and I only pronounce that the libellants were not by any wrongful act of the master prevented returning in the ship and completing the voyage according to their contract, and that therefore no suit can be sustained here upon those open articles. I regard it as a settled rule, upon the whole current of authorities, that suits will not be entertained in admiralty courts on behalf of foreign seamen for the recovery of wages, unless it be made to appear that the voyage is broken up, and that they are discharged the ship, and disabled from performing their contract, and seeking redress in their home tribunals, by the wrongful act of the master. Judge Story collects the leading cases upon this subject which have occurred in this country and the English courts, and that controlling principle runs throughout the decisions on the multifarious combination of facts. Abb. Shipp. 478, note [Hoover v. Reilly, Case No. 6,677]; Willendson v. The Forsoket [Id. 17,682], is essentially this case as to all the prominent facts, and in that Judge Peters refused to sustain the sailors' suit. Vide Davis v. Leslie [Id. 3,639].

COCHRAN, The NEIL. See Case No. 10,087.

COCHRAN (SPARHAWK v.). See Case No. 13,203.

COCHRAN (UNITED STATES v.). See Case No. 14,821.

COCHRANE. In re. See Cases Nos. 6,109 and 6,110.